UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA                              CRIMINAL ACTION

VERSUS                                                    No. 07-025

CHARLES DAVIS                                            SECTION: I

ORDER AND REASONS

Before the Court is the motion of defendant, Charles Davis, to suppress evidence obtained by law enforcement officials during a vehicle search, as well as defendant's subsequent incriminating statements to law enforcement, all of which occurred on January 25, 2007.  A suppression hearing was held on April 2, 2007, to consider evidence regarding the traffic stop and search of the vehicle as well as defendant's subsequent incriminating statements.  After considering the evidence and testimony, the arguments of the parties, and the law, for the following reasons, defendant's motion to suppress is **DENIED.**

*Background*

On January 25, 2007, at approximately 10:41 a.m., Tangipahoa Sheriff Deputy Henry Neihaus observed a white and blue 37-foot

motor home weave three times across the right fog line, approximately six to eight inches, on Interstate 12 at milepost 51.  The motor home driver was defendant, Charles Davis, who was traveling eastbound when he was stopped by Neihaus for improper lane usage.

Neihaus's suspicions were initially aroused during the stop because defendant was alone in a large motor home and he had an out-of-state Texas driver's license.  During initial questioning, defendant told Neihaus that he was traveling from Houston to the Beau Rivage Casino in Mississippi.  Yet, the rental agreement shown Neihaus for the motor home indicated that defendant's destination was Atlanta, Georgia.  Neihaus testified that defendant never indicated he was traveling to Atlanta and Neihaus was unaware of any motor home park existing at the Beau Rivage.  During initial questioning, defendant also was asked whether he had ever been arrested and Neihaus testified that defendant replied no.

Defendant appeared nervous and his hands were shaking when he handed Neihaus his driver's license and paperwork.  He also would not look at Neihaus directly when answering questions about his travel itinerary, but he did look at Neihaus when answering more general questions.

Neihaus proceeded back to his car to write a warning for the

traffic violation and to run a computer check on defendant's driver's license. The check revealed that defendant had a "narcotics related arrest" in the Atlanta area[1] which, given defendant's previous denial of a prior arrest, also aroused Neihaus's suspicions.

While Neihaus was at his car, Louisiana State Police Trooper Ron Whitaker, Jr., arrived as a backup unit. Whitaker advised that he had made a stop involving the same rental company, Bates Motor Homes of Texas, from which defendant rented his motor home; the earlier case occurred that prior December in Tangipahoa Parish and involved a substantial narcotics seizure.

Neihaus also testified that I-12, on which defendant was traveling, is a heavily trafficked roadway for narcotics trafficking. Houston and Atlanta also are known as high drug trafficking areas.

After completing the check and discussion with Trooper Whitaker, Neihaus issued defendant a courtesy warning for the traffic violation and returned defendant's driver's license and documents to him. Neihaus told defendant that the stop was over and that he was free to go. Still, based on all the foregoing activity, Neihaus was suspicious that defendant was engaged in drug trafficking activity. As defendant was walking away,

---

[1] At the hearing, Neihaus stated that he did not recall the date of the prior arrest or the specific offense committed and that such specific information was not included in his police report.

3

Neihaus asked him if he would mind answering a few other questions, and he replied "sure." When asked if there was any illegal contraband in the vehicle, defendant looked at the ground and mumbled "no." Neihaus asked defendant if he would consent to a search of the vehicle. Defendant initially stated he would consent to a search, but he withdrew his consent after partially signing the consent to search form, stating that he needed to speak to his lawyer.

   Neihaus then advised defendant that a narcotics detection dog would be dispatched to conduct a free air sweep of the vehicle's exterior. Neihaus told defendant that he could leave the area, but that the vehicle and its contents must remain until the dog completed its sweep. At approximately 10:56 a.m., Neihaus contacted three law enforcement agencies in an attempt to locate an on-duty canine unit, but no on-duty unit was available. An off-duty canine unit from the Tangipahoa Sheriff's office was dispatched, arriving in approximately 40 minutes. The canine alerted to the odor of narcotics on the lower compartments of the motor home on the driver's side. After defendant's keys were unable to open the compartments, law enforcement officers forced open one of the doors and found eight plastic wrapped bundles that field tested positive for marijuana.

   Neihaus then arrested defendant and advised him of his

*Miranda* rights.  Neihaus also contacted the DEA regarding the seizure of drugs.  Defendant and his vehicle were transferred to the sheriff's office substation where DEA Agent Chad Scott met Neihaus and defendant.

After advising defendant of his Miranda warnings, Scott and Agent Heath Martin interviewed defendant.  Scott testified that at no time did defendant ask for an attorney.  Scott indicated to defendant that the DEA was interested in securing defendant's cooperation and conducting a controlled delivery of the drugs.  Defendant provided details about his planned rendevous to deliver the drugs and stated that his contact's phone number was on his cell phone.  Scott retrieved the phone from the vehicle and defendant located the number in the cell phone and made calls from it.  Defendant also acknowledged that he knew about the marijuana in the vehicle, although not the specific amount.

Once the vehicle was relocated to the substation, law enforcement officers searched the interior.  In the presence of Scott, Agent Newman recovered a loaded gun from the map pocket behind the front passenger seat.  Scott asked defendant about the gun and Scott was shown defendant's permit to carry the gun.

Defendant also testified at the suppression hearing, offering at times an account of events contradictory to that offered by the Neihaus and Scott.  Defendant did not recall crossing over the fog line.  He stated that he was not nervous

when stopped, he was not shaking excessively, and he did not avoid eye contact when asked certain questions.  Defendant stated that he told Neihaus he was going to the Beau Rivage casino, but that he then would be continuing to Atlanta.  As for prior arrests, defendant stated he told Neihaus that he had a DUI in 1995.

Once defendant refused to sign the consent form, he testified that Neihaus never told him he was free to leave while the canine unit was being dispatched.  Defendant testified that he talked on his cell phone while he waited for the canine unit to arrive.  After the canine alerted to the presence of drugs and the drugs were recovered, defendant stated that he was placed under arrest and read his Miranda rights.  However, defendant testified that Scott never read him his rights before questioning him at the substation and, when he asked for a lawyer, Scott told him that he was just going to ask "relative questions" and defendant did not need to talk to a lawyer.

To the extent that defendant's testimony contradicts that of Neihaus and Scott, this Court finds that defendant lacks credibility and it finds the facts to be those as stated by Neihaus and Scott.  In addition to defendant's clear self-interest in skewing the facts so as to warrant suppression of the marijuana and his statements, the inconsistencies and lack of logic in defendant's testimony further undermine his credibility.

For instance, while defendant's story is that he intended to gamble at the Beau Rivage, then travel on to Atlanta and return to Houston, the second rental agreement only provided for a three-day rental period.[2]  Defendant's travel story, complete with the attendant change of pickup location and the rental of a mobile home in Texas to make a pickup in Mississippi, strains credulity.

In contrast, the Court finds that each of the officers' testimony was credible.[3]  Defendant's demeanor was far less than compelling and confirmed this Court's belief that defendant's testimony was not credible.

Davis argues that the search and seizure was in violation of the Fourth Amendment to the U.S. Constitution because:  1) the continued questioning of defendant after issuing the written warning exceeded the scope of the initial traffic stop and

---

[2] As explained during the course of defendant's testimony, defendant initially had rented a motor home through Bates Motor Homes of Texas with a rental agreement dated January 12, 2007.  That first rental agreement provided for a one week rental.  Defense Exhibit 1.  Defendant testified that the first motor home had some problems, leading him to rent a new motor home from Bates under a second rental agreement dated January 24, 2005.  Government Exhibit 1.  Defendant was driving this second motor home with the second rental agreement when stopped by Neihaus and Neihaus examined this second agreement during the stop.  This agreement provided for only a three day rental period.  Government Exhibit 1.  Davis testified that they were "going to extend the time on it [the second rental agreement] just like we did for the first one [rental agreement]."  The Court doubts the veracity of that statement, and finds it odd that defendant would enter into a three day rental agreement if his true plan was to travel through Mississippi, stop at the Beau Rivage, and travel on to Atlanta and then back to the Houston area.

[3] Indeed, the Court notes that if the officers truly desired to bolster their case against defendant by casting the truth aside, they could have presented a fact pattern far more sympathetic to the government than the truth offered.

7

occurred without further reasonable suspicion and 2) the warrantless roadside search of the vehicle and subsequent search at the substation were illegal. Davis also argues that the incriminating statements he made to law enforcement officers were obtained in violation of his Fifth Amendment rights, as he was not read his *Miranda* rights and his request at the substation to speak with an attorney was disregarded.

### *Law and Analysis*

**I.   The Traffic Stop**

Defendant challenges both the traffic stop and the subsequent search of his vehicle. The Fourth Amendment requires that every search and seizure by a government agent be reasonable. U.S. Const. amend IV. A traffic stop constitutes a seizure and such a seizure, i.e., an investigative detention, is governed by the reasonable suspicion standard set forth in *Terry v. Ohio* rather than the familiar probable cause standard. 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); *see United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005); *see also Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S. Ct. 3138, 3150, 82 L. Ed. 2d 317 (1984). The propriety of an investigative detention, commonly called a *Terry* stop, is analyzed using a two-part inquiry:  1) whether the officer's action was justified at its inception, and 2) whether the search or seizure was reasonably related to the circumstances that justified the stop.

*United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004).

As noted above, a traffic stop is justified at its inception if the officer's action was premised on reasonable suspicion. Reasonable suspicion entails "'some minimal level of objective justification' for making a stop," that is, the officer "must be able to articulate something more than an 'inchoate or unparticularized suspicion or "hunch."'" *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 1585, 104 L. Ed. 2d 1 (1989)(citing *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, and *INS v. Delgado*, 466 U.S. 210, 104 S. Ct. 1758, 80 L. Ed. 2d 247 (1984)). The reasonable suspicion required for a *Terry* stop is less demanding than the level of suspicion required for probable cause. *Id.* A finding of reasonable suspicion is judged after considering the totality of the circumstances. *United States v. Grant*, 349 F.3d 192, 197 (5th Cir. 2003). Considering the totality of the circumstances, the Court finds that Neihaus was reasonable both in making the traffic stop and in detaining Davis in order to fully investigate his reasonable suspicion of drug trafficking activity.

Initially, the traffic stop was effected because of a moving violation and the propriety of that traffic stop is clear.[4] The

---

[4] In his motion to suppress, defendant states, "[I]t appears that at least crossing over the white fog line three times was a valid reason for initiating the stop of Mr. Davis." Rec. Doc. No. 17, p. 5. Notwithstanding the fact that, at the hearing on the motion to suppress, defendant denied crossing over the line, defendant's testimony is rejected in favor of that provided by Neihaus. Neihaus had no reason to testify falsely regarding the reason for the initial

first prong of the two-part inquiry is satisfied.

After checking Davis's criminal history, the continued detention of defendant was proper for the reasons articulated by Neihaus.  This is not a case where the officer should have released defendant after the computer check came back negative.  Neihaus testified, based on his experience, that he believed Davis was engaged in drug trafficking activity.  Neihaus articulated the following circumstances which supported his belief:  (1) that Davis acted nervous and his hands were shaking, (2) that Davis was traveling alone from out-of-state in a large motor home,[5] (3) that Davis avoided eye contact when answering questions about his travel plans and when asked whether there was contraband in the vehicle, (4) that both the Houston area, where Davis initiated his trip, and Atlanta, his intended destination according to the rental agreement seen by Neihaus, are high drug trafficking locations, (5) that Interstate 12 is a known drug corridor, (6) that Davis's statement to Neihaus regarding his travel plans was inconsistent with the stated destination on the rental agreement,[6] (7) that Davis lied to Neihaus when he stated he had no prior arrests as Davis had a prior narcotics related

---

stop.

[5]The Court notes that defendant never told Neihaus that he worked as a commercial driver.

[6]Both the first and second rental agreements state that the destination is Atlanta, Georgia.  Defense Exhibit 1; Government Exhibit 1.

10

arrest, and (8) that Bates Motor Homes of Texas, from which Davis rented the motor home, also was connected to a motor home from which a substantial narcotics seizure was recently made in the same parish.

Defendant contends that Neihaus's continued questioning was unreasonable and exceeded the time necessary to complete the traffic stop.  "Once the purpose of a valid traffic stop has been completed and an officer's initial suspicions have been verified or dispelled, the detention must end unless there is additional reasonable suspicion supported by articulable facts."  *United States v. Gonzalez*, 328 F.3d 755, 758 (5th Cir. 2003).  To the extent defendant's seizure was prolonged beyond the scope of the initial traffic stop, the Court finds that Neihaus had reasonable suspicion to justify the continuation of the stop while the canine unit was dispatched and completed its sweep.  *See United States v. Jones*, 234 F. 3d 234, 241 (5th Cir. 2000) (noting that reasonable suspicion is judged by the totality of the circumstances and "the collective knowledge and experience of the officer[] involved").

Defendant relies on a line of precedent stemming from the Fifth Circuit's decision in *United States v. Dortch*, 199 F.3d 193 (5th Cir. 1999).  In *Dortch*, the court found that the police officer exceeded the valid scope of a *Terry* traffic stop by detaining defendant after the computer check came back negative

11

in order for a canine unit to search the defendant's vehicle. *Id.* at 198. The Court found that no reasonable suspicion existed that the defendant was trafficking in drugs to justify this continued detention:

> [T]he confusion as to the relationship of Dortch to the proper renter of the vehicle, combined with Dortch's absence as an authorized driver on the rental agreement and the allegedly inconsistent answer about the stay in Houston, gave rise only to a reasonable suspicion that the car might have been stolen.

*Id.* at 199. The Court also found that the defendant's nervousness was insufficient to create reasonable suspicion. The Court, therefore, found the extended detention, after the computer check came back negative, to be an unreasonable seizure in violation of the Fourth Amendment. *Id.*

Likewise, in *United States v. Jones*, police initiated a stop of defendants for a traffic violation inside the city limits of Amarillo, Texas. 234 F.3d 234, 237 (5th Cir. 2000).[7] The police officer raised three bases for his reasonable suspicion to justify continuing the stop after the computer check came back negative: (1) defendants' allegedly inconsistent answers with respect to questions surrounding the defendants' place of employment, (2) defendants' contradictory responses about the precise job that one defendant held, and (3) one defendant's acknowledgment that he had previously been arrested on a crack

---

[7]The Court's decision addressed the appeals of both defendants, the car driver and passenger, in consolidated fashion. 234 F.3d at 236.

cocaine charge.  *Id.* at 241.

Finding the alleged inconsistencies in the defendants' answers to be nonexistent and/or immaterial, the Fifth Circuit found no basis for reasonable suspicion on those points.  The Court also found that defendant Daniel's prior arrest, which he acknowledged to the officer, was insufficient to generate reasonable suspicion:  "[a prior] arrest alone does not amount to reasonable suspicion."  *Id.* at 242 (citing *Dortch*, 199 F.3d at 196, 199; *United States v. Lee*, 73 F.3d 1034, 1040 (10th Cir. 1996)).  Therefore, as in *Dortch*, the Court found that there was no reasonable suspicion of drug trafficking to justify extending the stop after the computer check came back negative.  *Id.* at 241-42.

By contrast, in *United States v. Gonzales*, the Fifth Circuit upheld the extended stop of a motorist based on the officer's reasonable suspicion.  328 F.3d 755 (5th Cir. 2003).  In *Gonzales*, police stopped the defendant on Interstate 20 for a lane violation.  After issuing the defendant a traffic citation, the police officer asked the defendant whether he had been arrested before, and he admitted one prior arrest on a possession charge.  In fact, the background check revealed that the defendant's driver's license was currently suspended and that he previously had been arrested two or three times for transporting

narcotics.[8]  After denying that any drugs were present in his vehicle, the defendant consented to a search of the car, which ultimately resulted in the discovery of drugs.  *Id.* at 757.

Addressing defendant's argument that police exceeded the scope of the initial stop and lacked reasonable suspicion, the Fifth Circuit held:

> Several articulable facts support reasonable suspicion of drug activity in this case. Officer Wright testified that Gonzalez appeared very nervous, was hesitant in answering the most basic questions about his travel plans, lied about why he didn't have a driver's license, was 500 miles away from the road leading to his claimed destination, was on a road associated with drug trafficking, and had been arrested for drug trafficking in the past. These facts together gave rise to a reasonable articulable suspicion that Gonzalez was involved in drug trafficking.

*Id.* at 758.  The court held that this reasonable suspicion justified the continued detention of the defendant to investigate the possible presence of drugs.  *Id.* at 759.  *See also United States v. Powell*, 137 Fed. Appx. 701, 706-07 (5th Cir. 2005) (unpublished) (finding continued detention after completion of computer check was justified by reasonable suspicion based on several factors taken as a whole:  late hour of night, travel on known drug corridor, driver's side window not fully rolling down as indication of drugs hidden in door compartment, defendant's hands shaking, and officer discrediting defendant's travel

---

[8]Gonzales had given the officer a Texas photo I.D., claiming that he did not have his driver's license because he was having it renewed.  328 F.3d at 756.

story).

Considering the answers given by defendant to Neihaus's questions in concert with defendant's behavior, *e.g.*, traveling alone in a large motor home, nervousness and avoidance of eye contact, answers inconsistent with the rental agreement, travel to and from drug source cities along a known drug corridor, his lie regarding his prior arrest, as well as other facts, *e.g.*, the communication of a prior narcotics related arrest and the connection of the rental company to a recent drug seizure in the area, Neihaus ultimately concluded that criminal activity may be afoot.

Beyond the mere nervousness and travel plan inconsistencies in *Dortch*, and the inconsistent statements and prior arrest in *Jones*, the present case involves a confluence of factors that, as in *Gonzales* and *Powell*, gave rise to reasonable suspicion and a proper tailored inquiry regarding possible drug trafficking activity.  Based on the officer's knowledge and experience[9] and in light of the totality of the circumstances, the Court finds that the numerous facts articulated by Neihaus gave rise to a reasonable suspicion that Davis may have been involved in drug trafficking.  While 40 minutes elapsed before the canine unit arrived, "There is ... no constitutional stopwatch on traffic

---

[9]Neihaus has been employed by the Tangipahoa Sheriff's office for seven years.  He testified that he has been to schools and conferences regarding narcotics interdiction and has been involved with approximately 25 to 30 stops involving narcotics.

stops."[10]  *Brigham*, 382 F.3d at 511.  The Court concludes that Davis's continued detention did not violate the Fourth Amendment.

**II.  The Search**

Having found Davis's continued detention to dispatch the canine unit permissible, there was no constitutional violation in having the canine conduct a free-air sweep of the motor home. *See, e.g.*, *U.S. v. Duffaut*, 314 F.3d 203, 208 (5th Cir. 2002) (canine sniff of the exterior of a vehicle does not constitute a search within the Fourth Amendment and defendant's consent was not needed to perform this free-air search).  In turn, the canine's positive alert to the presence of drugs in the motor home compartments gave rise to probable cause to search those compartments for drugs without a warrant.  *Id.*; *U.S. v. Dovali-Avila*, 895 F.2d 206, 207 (5th Cir. 1990) ("dog alert" sufficient to create probable cause to conduct a warrantless vehicle search).

Having found marijuana in the motor home compartments, the officers had probable cause to search the remainder of the vehicle for contraband, especially given the size of the interior

---

[10]"Instead, the relevant question in assessing whether a detention extends beyond a reasonable duration is 'whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly.'" *Brigham*, 382 F.3d at 511 (quoting *U.S. v. Sharpe*, 470 U.S. 675, 686, 105 S. Ct. 1568, 1575, 84 L. Ed. 2d 605 (1985)).  Given Neihaus's diligence in contacting three law enforcement offices in an effort to have a canine unit dispatched forthwith, and noting that had defendant agreed to consent to a search the need for the canine unit would have been obviated, the Court finds that Neihaus acted diligently and quickly under the circumstances to pursue his reasonable suspicion.

16

of the motor home and the presence of such a large quantity of drugs in the exterior storage compartments.  *See U.S. v. Seals*, 987 F.2d 1102, 1107 (5th Cir. 1993).

Defendant has suggested that any authority for a warrantless search of the vehicle terminated when the vehicle was moved from the site of the stop to the sheriff's substation.[11]  However, Fifth Circuit precedent, including that cited by defendant, clearly rejects this argument.  "If probable cause justified a warrantless search on the roadside, it likewise justified one at the station after the car was impounded."  *U.S. v. McSween*, 53 F.3d 684, 689 (5th Cir. 1995) (citing *U.S. v. Ross*, 456 U.S. 798, 807 n.9, 102 S. Ct. 2157, 2163 n.9, 72 L. Ed. 2d 572 (1982)).  As the Supreme Court explained in *Ross*, "[I]f an immediate search on the scene could be conducted, but not one at the station if the vehicle is impounded, police often simply would search the vehicle on the street-at no advantage to the occupants, yet possibly at certain cost to the police."  *Ross*, 456 U.S. at 807 n.9, 102 S. Ct. at 2163 n.9.[12]

Finally, defendant asserts that his cell phone was illegally

---

[11] Rec. Doc. No. 30, pp. 5-6.

[12] In the present case, Agent Scott testified that, after the marijuana was located, the vehicle was moved to the substation in Hammond for safety reasons and the search was conducted there.  This is fully consistent with the logic and holdings of *Ross* and *McSween*.
Alternatively, the search of the remainder of the vehicle and seizure of evidence therein would be permissible pursuant to an authorized inventory search.  *See Seals*, 987 F.2d at 1107-08 (holding that evidence in vehicle would have been inevitably discovered pursuant to inventory procedures).

seized and searched.  For the reasons previously explained, the search of the motor home and seizure of items within it, including the cell phone, was authorized.  Based on the testimony provided by Agent Scott, it appears that the police did not "search" the phone; rather, defendant provided the number of his contact from the phone and defendant made calls from the phone.  Regardless, a search of the lawfully seized phone for evidence of defendant's criminal activity was permissible.  *See U.S. v. Finley*, 477 F.3d 250, 259-60 (5th Cir. 2007) (where warrantless seizure of cell phone was authorized, police had authority to search the contents of phone without warrant).

### III.  Custodial Interrogation

Based on defendant's assertions that Agent Scott did not read him his *Miranda* rights and dismissed his request for an attorney, defendant also moves to suppress his incriminating statements at the station house, as they were obtained in violation of the Fifth Amendment.  The facts and the law lead this Court to conclude otherwise.

It is well established that "the Fifth Amendment privilege against self-incrimination prohibits admitting statements given by a suspect during 'custodial interrogation' without a prior warning."  *United States v. Gonzales*, 121 F.3d 928, 939 (5th Cir. 1997)(quoting *Illinois v. Perkins*, 496 U.S. 292, 296, 110 S. Ct. 2394, 2396-97, 110 L. Ed. 2d 243 (1990)).  In *Miranda v. Arizona*,

the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."  384 U.S. 436, 444, 86 S. Ct. 1602, 1612, 16 L. Ed. 2d 694 (1966).  Statements made in violation of these requirements are not admissible in court. *United States v. Ackerman*, 704 F.2d 1344, 1348 (5th Cir. 1983).

An express written or oral waiver of the defendant's Miranda rights is not necessary to establish a valid waiver, as long as the circumstances demonstrate that the defendant voluntarily waived those rights.  *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979).  The government must prove by a preponderance of the evidence that a defendant voluntarily waived his *Miranda* rights and that the statements he made were voluntary.  *U.S. v. Rico*, 51 F.3d 495, 507 (5th Cir. 1995).  A statement is voluntary when, taking into consideration the "totality of the circumstances," the accused spoke as a result of his free and rational choice, with an awareness of his abandonment of the right to remain silent and of the consequences of that decision.  *Id.*

As stated, this Court finds Agent Scott's testimony to be credible and finds the facts to be those as stated by him, rather than the version of facts presented by defendant.  Accordingly,

19

based on such testimony, the Court finds that defendant was advised of his *Miranda* rights and voluntarily elected to be interviewed.[13]  The Court further finds that at no time following his arrest did defendant request to speak with an attorney. Therefore, the Court concludes that defendant knowingly waived his *Miranda* rights and voluntarily made statements to law enforcement officers.[14]  Those statements are admissible.

Accordingly,

For the above and foregoing reasons, **IT IS ORDERED** that the motion[15] to suppress of defendant, Charles Davis, is **DENIED.**

New Orleans, Louisiana, this \_\_\_13th\_\_\_ day of April, 2007.

```
                                    LANCE M. AFRICK
                            UNITED STATES DISTRICT JUDGE
```

---

[13] The Court also notes that defendant admits that Neihaus read him his *Miranda* rights at the time of arrest.  There is nothing in the record to indicate that defendant "either no longer understood those warnings or did not appreciate their applicability."  See *U.S. v. Clay*, 408 F.3d 214, 222 (5th Cir. 2005).

[14] Besides defendant's assertions that he was not read his *Miranda* rights by Scott and that his request for an attorney was disregarded–assertions which this Court does not find credible—there is no evidence indicating that defendant's statements were coerced or involuntary.  To the contrary, Scott's testimony regarding defendant's explanation of his involvement in the trafficking scheme and attempts to locate his contact, "Twenty", offers further evidence of defendant's voluntary cooperation.

[15] Rec. Doc. No. 17.